# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### Filed: October 29, 2021

```
* * * * * * * * * * * * * **
TRACY PRUITT,                    *        No. 17-757V
                                 *
          Petitioner,            *        Special Master Sanders
                                 *
v.                               *
                                 *
SECRETARY OF HEALTH              *        Decision Awarding Damages; Pain and
AND HUMAN SERVICES,              *        Suffering; Hepatitis B ("Hep. B") Vaccine;
                                 *        Shoulder Injury Related to Vaccine
          Respondent.            *        Administration ("SIRVA")
* * * * * * * * * * * * * **
```

*Jessica Olins,* Maglio Christopher & Toale, Seattle, WA, for Petitioner.
*Darryl Wishard,* U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION AWARDING DAMAGES[1]

On June 8, 2017, Tracy Pruitt ("Petitioner") filed a petition for compensation pursuant to the National Vaccine Injury Compensation Program ("Program" or "Vaccine Program").[2] Petitioner alleged that the Hepatitis B ("Hep. B") vaccine she received on August 10, 2015, caused her to suffer a shoulder injury related to vaccine administration ("SIRVA"). Pet. at 1, ECF No. 1. On February 20, 2018, then-Chief Special Master Dorsey issued a Ruling consistent with Respondent's concession that Petitioner was entitled to compensation. ECF No. 26. The case proceeded to damages, but the parties remain unable to agree on an amount for pain and suffering.

For the reasons discussed below, and after considering the entire record and argument from the parties, I find that Petitioner is entitled to **$185,000.00**, representing actual past pain and suffering plus **$1,799.62** for past unreimbursed expenses, for a total of **$186,799.62.**

---

[1] This Decision will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet**. In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to delete medical or other information that satisfies the criteria in § 300aa-12(d)(4)(B). Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted Decision. If, upon review, I agree that the identified material fits within the requirements of that provision, such material will be deleted from public access.
[2] The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-10 et seq. (hereinafter "Vaccine Act," "the Act," or "the Program").

I.     **Procedural History**

This case was originally assigned to the Special Processing Unit ("SPU"). ECF No. 4. In his Rule 4(c) report, Respondent conceded that Petitioner was entitled to compensation, and the Chief Special Master consequently issued a ruling on entitlement in favor of Petitioner. ECF Nos. 23, 26. On February 23, 2018, the Chief Special Master issued an order initiating the damages phase, and Petitioner continued to file updated medical records. ECF Nos. 27, 29. The parties engaged in negotiations for two years but were unable to agree on a damages award for pain and suffering. *See* ECF Nos. 30, 38, 44, 48, 51, 59, 63. Petitioner filed a memorandum of facts and law in support of her motion for ruling on damages on December 9, 2019. Pet'r's Mem., ECF No. 68. She requested $225,000.00 in actual pain and suffering, plus $1,500.00 annually for the remainder of her life expectancy. *Id.* at 5, 21. Respondent filed a brief regarding damages on January 9, 2020, and proposed an award of $130,000.00 in actual pain and suffering. Resp't's Br., ECF No. 71. The parties agreed that $1,799.62 was the appropriate amount for Petitioner's past unreimbursed expenses. *Id.* at 1. On April 3, 2020, the case was reassigned to me. ECF No. 75. On April 12, 2021, Petitioner filed a motion to amend the caption to reflect a name change, which was granted. ECF No. 78. Petitioner filed a status report on September 15, 2021, indicating that she has no updated medical records since her December 9, 2019 filing. ECF No. 80. This matter is now ripe for adjudication on the issue of damages.

II.    **Medical History**

Petitioner did not have any relevant medical history prior to vaccination. She received the Hep. B vaccine in her right shoulder on August 10, 2015. Pet. at 1–2.

On September 16, 2015, Petitioner was seen by Corp. Gary Mellick, D.O., with complaints of pain in her right shoulder that began immediately after her vaccination. Pet'r's Ex. 5 at 5, ECF No. 5-6. Petitioner stated that "[t]he day she got her injection her arm was killing her. The next day it was still hurting but not as bad. [She] had some pain from the injection." *Id.* The notes from that visit indicate that Petitioner's employer, Dr. Marshall had "told her the shot was given to [sic] high." *Id.* The note also stated that Dr. Marshall explained to Petitioner that the shot "could have hit a nerve because the pain radiates up her neck and causes headaches." *Id*. Dr. Mellick prescribed Petitioner gabapentin, 300 mg three times per day. *Id*. He also referred her for an X-ray and MRI of her right shoulder. *Id*. The MRI performed on September 20, 2015, revealed supraspinatus tendonosis.[3] Pet'r's Ex. 2 at 27, ECF No. 5-3; Pet'r's Ex. 5 at 5.

Dr. Mellick noted during a follow-up on October 23, 2015, that "[Petitioner] stopped gabapentin because it was not helping her shoulder. She takes [over the counter] arthritis medicine. She states there have been a couple of times she has woken up with her shoulder hurting from her laying on [it]." Pet'r's Ex. 5 at 5. Dr. Mellick also noted that Petitioner had "never had shoulder problems until she got the Hep[.] B shot" and referred her for an orthopedic evaluation. *Id*. On November 11, 2015, Petitioner saw Dr. Hartzog at Gadsden Orthopedic Associates. Pet'r's Ex. 2 at 23. Dr. Hartzog reviewed the images from Petitioner's MRI, noting there had been "[n]o history

---

[3] Tendonosis or tendinosis is another name for tendinopathy. Tendinopathy is "any pathologic condition of a tendon[.]" *Dorland's Illustrated Medical Dictionary* 1263, 1881 (32nd ed. 2012) [hereinafter "*Dorland's*"].

of trauma, but [Petitioner] did receive [a] possibly misplaced intramuscular injection very high on that shoulder[.]" *Id*. Dr. Hartzog also noted that Petitioner "demonstrates no significant tear." *Id*. On physical examination, he found "[p]ain with abduction greater than about 70 to 80 degrees maximized with internal rotation in the abducted position. Pain in the shoulder and upper brachium[4] with some tenderness about the anterior and lateral acromion[5] as well as over the greater tuberosity."[6] *Id*. He administered a cortisone injection. *Id*.

According to a report from an April 13, 2016 follow-up visit with Dr. Hartzog, Petitioner "has gotten some moderate relief with [the] steroid injection and actually wants to repeat that again today." *Id*. at 22. Petitioner received a second cortisone injection. *Id*. Petitioner's pain persisted despite the second injection and on April 22, 2016, Petitioner underwent a second MRI of her right shoulder. *Id*. at 26. The results of the MRI revealed "moderate severity [acromioclavicular ("AC")][7] spurring." *Id*. The MRI also showed tearing of the inferior glenoid labrum[8] with a posterior septated paralabral cyst, measuring 2 cm." *Id*. Additionally, under impressions, Dr. Hartzog noted a "[p]artial thickness tear [of the] distal supraspinatus tendon[.]" *Id*.

On May 5, 2016, after her second MRI, Petitioner followed up at Gadsden Orthopedics and was seen by Dr. Wilson. *Id*. at 11. Her examination revealed normal strength, range of motion ("ROM"), and muscle tone in her right shoulder, but Petitioner reported pain associated with active ROM. *Id*. Dr. Wilson wrote that "[i]t is possible her shoulder is worsened from aggravation of the injection, and has not improved due to worsening of the bursitis[9] in the subacromial space." *Id*. at 12. Petitioner was referred for a right shoulder arthroscopy[10] with subacromial decompression and distal clavicle excision. *Id*.

On May 25, 2016, Petitioner underwent shoulder surgery "with subacromial decompression and partial acromioplasty, with coracoacromial release – right side . . . [and] with distal claviculectomy including distal articular surface (Mumford procedure)[11] – right side." *Id*. at 18; Pet'r's Ex. 4 at 130–31, ECF No. 5-5. The noted findings were: "[t]earing of the biceps tendon at the root > 50%; Hypertrophic bursitis [with] AC spurring." Pet'r's Ex. 2 at 18. Petitioner saw Dr. Wilson for a follow-up on June 16, 2016, with complaints of soreness, particularly at night, despite the surgery and at-home exercise. *Id*. at 6. On August 25, 2016, Petitioner returned to Dr. Wilson with continued complaints of soreness and shoulder pain when reaching behind her. *Id*. at

---

[4] The brachium is the "1. arm: the part of the upper limb from shoulder to elbow. 2. an armlike process or structure." *Dorland's* at 244.

[5] The acromion is "the lateral extension of the spine of the scapula, projecting over the shoulder joint and forming the highest point of the shoulder[.]" *Dorland's* at 20.

[6] A tuberosity is "an elevation or protuberance[.]" *Dorland's* at 1983.

[7] The acromioclavicular ("AC") joint is "the synovial joint between the acromion of the scapula and the acromial extremity of the clavicle[.]" *Dorland's* at 971.

[8] The glenoid labrum is "a ring of fibrocartilage attached to the rim of the glenoid fossa of the scapula, increasing the depth of the cavity[.]" *Dorland's* at 995.

[9] Bursitis is "inflammation of a bursa, occasionally accompanied by a calcific deposit in the underlying tendon; the most common site is the subdeltoid bursa." *Dorland's* at 264.

[10] Arthroscopy is an "examination of the interior of a joint with an arthroscope." *Dorland's* at 158.

[11] The Mumford Procedure is also known as a distal clavicle excision or distal clavicle resection. A clavicle excision is a procedure for "removal of a portion of [the distal end] of the clavicle[]" to alleviate shoulder pain. *Dorland's* at 370, 657.

2. Dr. Wilson administered another cortisone injection into Petitioner's right shoulder. *Id.* at 3. Petitioner returned to Dr. Wilson on October 6, 2016, complaining of continued right shoulder pain with "reaching behind and lifting objects." Pet'r's Ex. 11 at 2, ECF No. 29-2.

There are no medical records indicating follow up or treatment for Petitioner from her October 6, 2016 appointment to May 2018. Petitioner indicates in her damages motion that her "symptoms continued and progressed over [that time], despite taking her prescribed medications and continuing her at-home exercise regimen." Pet'r's Mem. at 8. On May 4, 2018, Petitioner sought a second opinion for her continued shoulder pain and was seen by Dr. Hester of Dekalb Orthopedics and Sports Medicine. Pet'r's Ex. 12 at 5, ECF No. 33-2. Dr. Hester assessed Petitioner with a superior glenoid labrum lesion of the right shoulder and pain, and he prescribed a Medrol DosePak.[12] *Id.* at 6. Petitioner was also scheduled for another MRI, which revealed:

> 1. Full-thickness supraspinatus tendon tear with contrast extravasation. Partial infraspinatus tendon tearing with delamination . . . . 2. Mild acromioclavicular joint osteoarthritis with a type 2 acromion and 8 mm of AC joint separation. 3. Superior labral tearing with extension into the posterior and inferior labrum, and a probable sub[-]labral foramen.

Pet'r's Ex. 14 at 1, ECF No. 35-2.

On May 23, 2018, Petitioner returned to Dr. Hester for further evaluation. Pet'r's Ex. 12 at 8. Dr. Hester assessed Petitioner with a traumatic rupture of the right rotator cuff and scheduled a second shoulder surgery. *Id.* at 8–9. On July 11, 2018, Petitioner underwent a right shoulder arthroscopy with rotator cuff repair, arthroscopy with superior labrum anterior and posterior ("SLAP") lesion repair, biceps tenodesis, and was subsequently referred to post-surgical physical therapy ("PT"). Pet'r's Ex. 19 at 12, ECF No. 46-2; Pet'r's Ex. 27 at 30, ECF No. 66-5.

Petitioner began PT on July 30, 2018. Pet'r's Ex. 18 at 43, ECF No. 45-2. She attended fourteen PT sessions over the following two months. *Id.* at 5–36. On October 11, 2018, Petitioner was seen by C.R.N.P. Shannon Hilley for post-surgery follow up. Pet'r's Ex. 21 at 17, ECF No. 54-2. The records note that Petitioner's ROM was continuing to improve. *Id.* Petitioner was told to continue her home exercise program with sleeper stretch. *Id.* at 17–18.

Petitioner continued to complain of mild supraspinatus tendonitis symptoms to treaters in 2019. *Id.* at 8. She was prescribed Mobic[13] for the pain and was told to continue her home exercise plan. *Id.* In October 2019, Petitioner was again prescribed a Medrol DosePak. Pet'r's Ex. 24 at 1, ECF No. 66-2. On October 30, 2019, Petitioner was seen by Wayne McGough, M.D., and Katherine Ivey, PA-C, to complete a comprehensive evaluation of her ongoing right shoulder symptoms. Pet'r's Ex. 26 at 1, ECF No. 66-4; Pet'r's Ex. 29 at 1, ECF No. 66-7. Petitioner did not

---

[12] A Medrol DosePak is "a prescription of Medrol. Medrol is the "trademark for preparation of methylprednisolone." *Dorland's* at 1120. Methylprednisolone is "a synthetic glucocorticoid [steroid] derived from progesterone, used in replacement therapy for adrenocortical insufficiency and as an anti[-]inflammatory and immunosuppressant in a wide variety of disorders[.]" *Id.* at 1154.

[13] Mobic is the "trademark for a preparation of meloxicam." *Dorland's* at 1171. Meloxicam is "a nonsteroidal anti-inflammatory drug used in the treatment of osteoarthritis[.]" *Id.* at 1126.

report pain at rest, but noted pain with extensive shoulder use, difficulty putting on a bra, and sharp, burning pain when playing with her children or baking. Pet'r's Ex. 29 at 12. She also reported that she self-treats with Tylenol when needed. *Id.* Dr. McGough's notes suggest that Petitioner may have developed scar tissue after her two surgical procedures. *Id.* at 13. There was no recommendation for continued treatment "since her pain is not constant and does not seem to be interfering with her life." *Id.* Dr. McGough also noted that additional treatment would be unlikely to improve Petitioner's shoulder function. *Id.*

Petitioner submitted the Client Shoulder Injury Questionnaire from her visit with Dr. McGough and PA-C Ivey, dated October 30, 2019. Pet'r's Ex. 26 at 1. Petitioner recorded that she experienced no pain during right shoulder ROM testing, and a 5/5 strength rating. *Id.* Petitioner indicated that her pain rating was a 0/10 at rest and 5/10 at worst. *Id.* An examination revealed continued limited ROM and pain with palpation. *Id.* The questionnaire also noted that while Petitioner had "reached maximum medical improvement" and was "unlikely to improve function," her shoulder injury was not designated as permanent. *Id.*

### III.   Petitioner's Supplemental Affidavit

Petitioner filed her supplemental affidavit on December 9, 2019, and described how her vaccine injury has changed her life. Pet'r's Ex. 28 at 3, ECF No. 66-6. Petitioner characterized herself as "a strong person [that] could take care of [her]self," before her injury prevented her from doing "things independently which require full strength and mobility of [her] right arm." *Id.* at 1. For example, Petitioner described her struggles to complete everyday tasks such as brushing her hair. *Id.* at 3.

It was also during this time period that Petitioner and her husband separated and subsequently divorced. *Id.* at 2. Pain notwithstanding, Petitioner struggled to transport herself to multiple doctors' appointments. *Id.* She also underwent surgery and post-operation therapy without the support of her former spouse. *Id.* Petitioner had to navigate all household duties and figure out "[w]ho was going to drive the kids to and from school and sports events[,]" and how to "pack up the house and find a new place to live with [her] children, all without the use of [her] right shoulder[.]" *Id.* Petitioner stated she did not receive child support from her husband and did not have "the luxury of paying someone to take care of [her] children or with tasks around [her] home." *Id.* at 3. Petitioner wrote "it became necessary to take over tasks that [her] ex-husband previously did, such as minor yard work and hanging pictures and shelves." *Id.* These activities caused increased pain and, she "continued to have issues with mobility." *Id.*

Petitioner started a new job after her second surgery, assisting homeless children and youth in her school district. *Id.* She described the difficulty she had completing an assignment where she was tasked with packing over 100 backpacks for students going back to school. *Id.* Petitioner was "unable to lift the heavy backpacks after they had been loaded with supplies and required assistance from colleagues to perform [her] work activities." *Id.* The difficulties continued when Petitioner had to lift boxes of supplies and deliver them to classrooms. *Id.* Petitioner wrote, that if she "couldn't get the supplies and clothing to these children, they would go without." *Id.* She felt compelled to complete her job "regardless of how [her] shoulder fe[lt]." *Id.* Petitioner states she did not have insurance coverage during this time and that is why she relied heavily on Tylenol and ibuprofen. *Id.*

Prior to her injury, Petitioner "enjoyed playing sports with [her] children and several hobbies, including baking and designing cakes[,] and crafting quilts." *Id.* at 1. Petitioner wrote that her rag quilts require "a lot of sewing and cutting to get the rag effect look." *Id.* at 2. Because she is right-handed, it has become difficult to do all the cutting. *Id.* Petitioner bought supplies to sew a quilt for each of her children, but has been unable to complete an entire quilt since her "right shoulder injuries and surgeries[.]" *Id.* Her injury has also prevented Petitioner from baking cakes. *Id.* at 1. Petitioner noted that her signature cakes are topped with an icing that requires hand mixing, and she lacks the strength in her right hand to stir long enough to obtain the necessary consistency. *Id.* Petitioner stated she is "known in town for her cakes," but she is no longer able to "make a cake every Friday for [her] children's football team and coaches." *Id.* at 1–2.

Petitioner described this injury's impact on her relationship with her children as "[t]he greatest disappointment." *Id.* at 4. Petitioner's children, ages 10, 13, and 15, "are all very active in sports, including baseball, softball, basketball, volleyball[,] and football." *Id.* at 2. Petitioner "takes her children to their games and practices," and she "is sad that [she] can no longer get out there and play with them for very long before her arm starts bothering [her]." *Id.* Petitioner recounted trying to play basketball with her children and noted that the resulting shoulder pain, which she described as "significant[,] lasted through the following day." *Id.* at 4. Petitioner wrote that this experience "has been an emotional rollercoaster with all that I have been through and to think about all that I might have to endure the rest of my life, over what most would consider a harmless [H]epatitis B vaccine; but to me, that vaccine has changed the way I live life." *Id.*

## IV.   Arguments regarding Damages

### a.   Petitioner's Argument

Petitioner asserts in her memorandum in support of her motion for damages that she "should be awarded $225,000.00 in actual pain and suffering for her injury," plus "$1,500.00 annually for the remainder of her life expectancy." Pet'r's Mem. at 24. Petitioner notes that she was a "competent, healthy adult at the time she received her vaccine." *Id.* at 5. Since her injury however, Petitioner argues (as of December 9, 2020) that she has had to undergo treatment for "the past four years, three months, four weeks, and two days." *Id.* She explains that she "continues to experience pain, limited [ROM], reduced strength, difficulty dressing, and difficultly performing work tasks." *Id.* As a result of her vaccine injury, Petitioner notes that she has had to change the way she lives her life, particularly in relation to her children. *Id.* Petitioner also explains that she "is no longer able to bake cakes, sew and build quilts or play sports with her children." *Id.* She notes that "[a]lthough the right shoulder pain seems to have improved, [she] still do[esn't] feel as if [her] right shoulder is fully healed." *Id.* Petitioner is "certain that [she] will always have issues with [her] right shoulder," and she fears that it "will never fully recover." *Id.*

In addition to her personal account, Petitioner provides caselaw that she argues is analogous to her case. *Id.* at 16. However, she distinguishes the cases from hers. *Id.* She notes that her case is different in that she had two shoulder surgeries, whereas the more common cases cite only one. *Id.* She further notes that in cases that received higher than average awards, "petitioners were characterized either by the need for surgical repair or by a longer duration of injury." *Id.* at 17. She identifies other factors present in cases with higher award amounts that are also relevant in her case, including MRI imaging that shows evidence of partial tearing, higher

6

levels of pain, and moderate to severe limitations in ROM. *Id.*

Petitioner compares the facts of her case to *Reed v. Sec'y of Health & Hum. Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) and argues that the cases are similar in the type of pain and impact of each petitioner's ability to care for her children. Pet'r's Mem. at 17. Petitioner notes that "[b]oth women received cortisone injections and Medrol DosePak prescriptions." *Id.* at 18. Petitioner also notes that both women underwent shoulder surgery. *Id.* Petitioner argues that her damages amount should be higher than the $160,000.00 awarded to the petitioner in *Reed* because she had to undergo a second surgery and her pain continues, necessitating additional orthopedic treatment, medication, and difficulty with activities of daily life. *Id.* at 19.

A second case that Petitioner relies heavily on is *Hooper v. Sec'y of Health & Hum. Servs.*, No. 17-12V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019). Petitioner argues that both she and the petitioner in *Hooper* had decreased ROM and were prescribed medication for pain management. Pet'r's Mem. at 19. Petitioner and the petitioner in *Hooper* also "received an MRI and a cortisone injection early into their treatment." *Id.* Petitioner notes that in both of these cases, a second MRI revealed the need for surgery, but Petitioner argues her injury is more severe because she required a second surgery that still did not resolve all of her symptoms. *Id.* at 19–21. Therefore, Petitioner asserts she should receive more than the $185,000.00 awarded in *Hooper. Id.* at 21; *Hooper,* 2019 WL 1561519, at *1.

In support of her claim for future pain and suffering, Petitioner asserts that she has continued pain and reduced ROM that cannot be alleviated with further treatment. Pet'r's Mem. at 22. She also reiterates that her injury creates "unique challenges [] in her day-to-day life as a working mother of three young children." *Id.*

### b. Respondent's Argument

Respondent's brief on damages characterizes Petitioner's second surgery as "a SLAP tear,[14] which is unrelated to her SIRVA." Resp't's Br. at 6. Respondent argues that "[t]he causes of SLAP tears are excessive forces and loads on this particular item due to trauma, overuse and force," and that "[t]here is no literature to support that vaccine administration can physiologically cause such excessive forces in this area far removed from the site of injection." *Id.* Furthermore, Respondent points to a nineteen-month gap in Petitioner's treatment prior to the diagnosis of her SLAP tear. *Id*. at 7. Respondent identifies cases that he asserts are comparable and "proposes an amount of no more than $130,000.00 based on the facts[]" of Petitioner's case. *Id.*

Respondent's next argument challenges the total length of time needed for Petitioner's treatment. Respondent notes that Petitioner received approximately fourteen months of treatment for her SIRVA related injuries, and another nineteen months of treatment for her "not related" SLAP tear. *Id.* He cites cases wherein petitioners were treated for eight- to- ten months. *Id.*; *Collado v. Sec'y of Health & Hum. Servs.*, No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec.

---

[14] A SLAP tear also known as a bucket-handle fracture. "SLAP" type tear is defined as a tear of the superior labrum from anterior to posterior. It is "a tear in the semilunar cartilage, along the middle portion, leaving a loop of cartilage lying in the intercondylar notch." *Dorland's* at 740.

Mstr. June 6, 2018) (awarding the petitioner $120,000.00 for a shoulder injury with symptoms that lasted for ten months and that improved after surgery); *Dobbins v. Sec'y of Health & Hum. Servs.,* No. 16-854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding the petitioner $125,000.00 for pain and suffering after recovering from SIRVA in approximately eight months); *Curri v. Sec'y of Health & Hum. Servs.,* No. 17-432V, 2018 WL 6273562 (Fed. Cl. Spec. Mstr. Oct. 31, 2018) (awarding the petitioner $120,000.00 for past pain and suffering and $10,254.11 for future pain and suffering after undergoing surgery and suffering a 22.5% permanent loss of her arm after more than a year of treatment); *Knudson v. Sec'y of Health & Hum. Servs.,* No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding the petitioner $110,000.00 in pain and suffering after experiencing symptoms for ten months). Respondent also references a case wherein the petitioner complained of pain for two years, received multiple steroid injections, and underwent surgery. Resp't's Br. at 8–9; *Selling v. Sec'y of Health & Hum. Servs.,* No. 16-588V, 2019 WL 3425224 (Fed. Cl. Spec. Mstr. May 2, 2019) (awarding the petitioner $105,000.00 for pain and suffering). In that case, the special master acknowledged that the petitioner's surgery may have been painful, while also noting that "[u]nlike [in] *Collado* and *Knudson . . .* [the p]etitioner's condition did not require open and invasive surgery." *Selling,* 2019 WL 3425224, at *6. Respondent argues that all these case are analogous to Petitioner case, and the awards, ranging from $105,000.00 to $125,000.00 provide support for their award request of $130,000.00. Resp't's Br. at 9.

In his brief, Respondent also addresses Petitioner's request for future pain and suffering. *Id.* Respondent notes that "[a]s of her last orthopedic visit in October 2019, [P]etitioner's pain was not constant, only occurred with overuse, and was rated 0/10 at rest." *Id.* Respondent also argues that Petitioner is not on prescription pain medication and that no further treatment was recommended. *Id.* Respondent argues against any future pain and suffering award. *Id.*

## V.     Legal Standard

Compensation awarded pursuant to the Vaccine Act may include an award "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, . . . not to exceed $250,000." § 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." § 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22–23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no precise formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9

(quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

A special master may also look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in each case. *See, e.g*., *Doe 34 v. Sec'y of Health & Hum. Servs.,* 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (2013).

In *Graves*, Judge Merrow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap, criticizing this as constituting "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, he found that pain and suffering should be assessed by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program, applying the statutory cap only thereafter. *Id.* at 595.

## VI.    SIRVA Case Compensation Factors

### a.  *Awareness of Suffering*

Awareness of suffering is not typically a disputed issue in cases involving SIRVA. In this case, neither party has raised, and the record does not indicate that Petitioner's awareness of suffering is in dispute. Based on the evidence and circumstances of this case, I find that Petitioner had full awareness of her suffering.

### b.  *Severity and Duration of Pain and Suffering*

Petitioner asserts that her injury is analogous to others in the Program that have received higher awards because of the severity and duration of her pain and suffering. Regarding severity, during the course of her treatment, Petitioner received three cortisone injections, underwent two surgeries, and attended fourteen post-surgery physical therapy sessions. Her claim is similar to the facts in *Reed* regarding treatment and in that both claims assert the injury caused difficulty interacting with children and grandchildren, performing activities of daily living, and performing all job duties. *See Reed,* 2019 WL 1222925. However, while Petitioner's case does involve an additional surgery, I find she suffered a less severe injury than the petitioner in *Reed*. *Id.* Indeed, Petitioner only described her pain as severe or disabling immediately after vaccination, when performing certain activities, and during sleep. And Petitioner's last evaluation record listed her pain as a 0 out of 10 at rest. In both cases, the complaints of pain lessened and were eventually

controlled with over-the-counter medicine. Furthermore, in both cases, treaters opined that further medical treatment would likely be unhelpful, and neither petitioner was determined to be disabled as a result of the injury.

While Petitioner also contends that her injury is analogous to *Hooper* in severity, I find this argument to be less persuasive. The petitioner in *Hooper* immediately sought medical treatment for pain that he consistently described as severe, or a ten out of ten on the pain scale. *Hooper,* 2019 WL 1561519, at *2. He attended sixty-six sessions of physical therapy (pre and post surgery) and underwent an acromioplasty and bursectomy. *Id.* at *5. Despite his surgery, the petitioner in *Hooper* was unable to do many activities he previously enjoyed because he ultimately lost "about 50% of his left arm function." *Id.* at *6. In the present case, Petitioner participated in only fourteen total physical therapy sessions, post surgery. She did not undergo any pre-surgery physical therapy, nor did she suffer any loss of arm function. I do not find Petitioner's claim here analogous to *Hooper* with respect to severity.

Petitioner further relies on *Hooper,* because the petitioner in that case reported a longer duration of injury than in *Reed. Compare Hooper,* 2019 WL 1561519 (wherein the special master assessed the petitioner's pain and suffering through the date of his last medical treatment as approximately two years and five months post vaccination), *with Reed,* 2019 WL 1222925 (wherein the special master assessed the petitioner's pain and suffering through the date of the hearing as approximately two years and four months post vaccination). The *Hooper* case is more analogous in duration to the instant case, in which treatment spans from Petitioner's original complaint in September 2015 to her discharge from treatment at the end of 2019, which is more than approximately four years.

Respondent argues that Petitioner's relevant treatment spanned a much shorter timeframe, because he completely discounts Petitioner's second surgery as unrelated to her vaccine injury. Respondent explains that SLAP tears are the result of "excessive forces and loads on this particular item due to trauma, overuse and force," and cannot be caused by SIRVA injuries. Resp't's Br. at 6. Petitioner has described the movement modifications she has had to make since her Hep. B vaccine with respect to her shoulder, the pain that she suffers when she over-reaches or over-extends her shoulder, and how that pain continued and got worse despite her home exercise and over-the-counter pain medication regimen. Respondent may be correct that the vaccination is not the direct cause of Petitioner's SLAP tear. However, it is consistent with Petitioner's account that movement modifications due to her limited ROM necessitated by her vaccine-related injury, lead to overuse, and excessive force and loads on this specific area of her shoulder.

Respondent further argues that the fourteen-month gap in treatment is evidence that Petitioner's later complaints and second surgery were caused by a distinguishable injury. Respondent made a similar contention in *M.W.,* but the chief special master did not agree. *M.W. v. Sec'y of Health & Hum. Servs.*, No. 18-0267V, 2021 WL 3618177 (Fed. Cl. Spec. Mstr. Mar. 17, 2021). The chief special master acknowledged the note in Petitioner's post-operative physical therapy records that "her right shoulder pain was essentially resolved and that she had done great with therapy." *M.W.*, 2021 WL 3618177, at *6. However, he then noted that there were similarities in Petitioner's complaints before the first and second surgeries, and "subsequent MRIs [following Petitioner's first surgery and the gap in treatment] showed similar findings to her very first MRI." *Id.* He found "no evidence that [Petitioner] had any type of right shoulder injury prior to her . . .

vaccination. The reemergence of her shoulder pain [over a year and a half later] is more likely than not attributed to her initial shoulder injury." *Id.*

Petitioner in this case also had similar MRI findings before her surgeries. Her second MRI, completed on April 22, 2016, immediately prior to her first surgery, revealed moderate severity acromioclavicular spurring, an inferior glenoid labrum tear, and a partial thickness tear of the distal supraspinatus tendon. Pet'r's Ex. 2 at 26. The results of Petitioner's MRI conducted approximately two years later, on May 11, 2018, immediately prior to her second surgery, revealed a full thickness supraspinatus tendon tear, a superior labrum tearing with extension into the posterior and inferior labrum, and mild acromioclavicular osteoarthritis. Pet'r's Ex. 14 at 1. These MRI findings are localized to her right side and follow a logical progression, by which Petitioner's overuse and compensation for her vaccine-related injuries, caused her subsequent SLAP tear. I find that Petitioner has presented preponderant evidence that her second surgery is more likely than not follow-up treatment for her initial vaccine-related shoulder injury.

Petitioner also noted a lapse in insurance that may account for some of the time that Petitioner did not seek treatment for her continuous injury. Therefore, I find, similar to *M.W.*, that "while [Petitioner's shoulder pain] varied in degree of severity, more likely than not, [it] persisted for the entire [] period of time" alleged by Petitioner. *Id.*

After a careful and comprehensive review of the facts of this case and in consideration of all the arguments presented by both parties along with relevant caselaw, I find that **$185,000.00** in compensation for past pain and suffering is reasonable in this case.

### c.  *Past Unreimbursed Expenses*

Petitioner has provided documentation of her past unreimbursed expenses. Pet'r's Ex 32, ECF No. 66-10. She has requested $1,799.62. *Id.* Respondent has reviewed Petitioner's filings and agreed that Petitioner is entitled to the requested amount of **$1,799.62.** Resp't's Br. at 1. Therefore, Petitioner is awarded the full requested amount for her past unreimbursed expenses.

### d.  *Future Pain and Suffering*

Finally, Petitioner has requested $1,500.00 annually for the rest of her life expectancy, resulting in a total requested amount of $70,200.00 for future pain and suffering. Petitioner was recently asked for any updated medical records or treatment plans, and she indicated that she has none as of December 2019. ECF No. 80. Furthermore, records from her last medical evaluation in 2019 note that there was no recommendation for continued treatment, because Petitioner is not in constant pain, and the injury she sustained "does not seem to be interfering with her life." Pet'r's Ex. 29 at 13. The client questionnaire that Petitioner completed during her final evaluation lists her resting pain at 0 and her worst pain at 5 out of 10. Pet'r's Ex. 26 at 1. Most importantly, although Petitioner has reached maximum improvement, her injury was not designated as permanent or disabling. Petitioner indicated that she manages her pain with Tylenol, and she does not appear to have a disabling or permanent injury. Petitioner's medical records do not demonstrate that it is more likely than not that Petitioner's injury is ongoing and debilitating. Therefore, I do not find that an award of future pain and suffering is appropriate in this case.

## VII.    Conclusion

I have reviewed all caselaw cited by the parties in support of their respective positions, as well as other relevant Program cases. However, I have not relied on any single decision or used any other claim as the basis for an award ceiling or floor in this case. After a review of the entire record and the parties' arguments, I find that Petitioner is entitled to a lump sum payment of **$186,799.62.** This amount consists of **$185,000.00** for actual pain and suffering plus **$1,799.62** requested for un-reimbursed medical expenses. This amount represents compensation for all damages that would be available under § 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[15]

   **IT IS SO ORDERED.**

s/Herbrina D. Sanders
Herbrina D. Sanders
Special Master

---

[15] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.